**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-2153-WJM-KAS

MARTIN MARIETTA MATERIALS, INC.,

      Plaintiff-Counterclaim Defendant,

v.

JEANNE IVERSON, and
TIMOTHY IVERSON,

      Defendants-Counterclaim Plaintiffs.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

---

      This contract dispute is before the Court on Defendants-Counterclaim Plaintiffs Jeanne Iverson and Timothy Iverson (jointly, "Iversons") Motion to Dismiss and for Summary Judgment. (ECF No. 67.) Plaintiff-Counterclaim Defendant Martin Marietta Materials, Inc.'s ("Martin Marietta" or "MMM") filed a response (ECF No. 69), to which the Iversons replied (ECF No. 70). For the following reasons, the Motion is granted in part and denied in part.

## I. STANDARDS OF REVIEW

**A.    Federal Rule of Civil Procedure Rule 12(b)(1)**

      A motion under Federal Rule of Civil Procedure 12(b)(1) is a request for the court to dismiss a claim for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A plaintiff generally bears the burden of establishing that the court has jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). When the court lacks

subject matter jurisdiction over a claim for relief, dismissal is proper under Rule 12(b)(1). *See Jackson v. City & Cnty. of Denver*, 2012 WL 4355556, at *1 (D. Colo. Sept. 24, 2012).

There are two types of motions to dismiss for lack of subject matter jurisdiction: facial attacks and factual attacks. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). A facial attack questions merely the sufficiency of the pleading. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). When reviewing a facial attack, the court takes the allegations in the complaint as true, as in a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Id.* If those allegations establish a federally cognizable claim, jurisdiction exists. *Id.*

In contrast, if a Rule 12(b)(1) motion "challenge[s] the substance of a complaint's jurisdictional allegations in spite of its formal sufficiency by relying on affidavits or any other evidence properly before the court[,] '[i]t then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction.'" *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (quoting *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)). On a factual attack, no presumption of truthfulness applies to the complaint's allegations. *Holt*, 46 F.3d at 1003. Instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *Id.* In making its decision, the court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Stuart*, 271 F.3d at 1225 (citation omitted).

Unless it is shown that no amendment of the pleadings could cure the jurisdictional defect, a dismissal for lack of subject matter jurisdiction generally is not a decision on the merits and, therefore, constitutes a dismissal without prejudice.  *See Bruzga v. Cnty. of Boulder*, 795 F. App'x 599, 604–05 (10th Cir. 2020) (stating that a dismissal based on lack of standing should be without prejudice); see also Fed. R. Civ. P. 41(b).

**B.    Federal Rule of Civil Procedure 56**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to a proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[1]

### A.    Gravel Lease

The Iversons own real property located in Weld County, Colorado.  (ECF No. 67, Movants' Statement of Material Facts ("MSMF") ¶ 1.)  The Iversons and Lafarge West, Inc. ("Lafarge") executed a Gravel Property Lease (the "Gravel Lease") on September 13, 2004.  (MSMF ¶ 2.)  Lafarge assigned all of its obligations, rights, and interest in the Gravel Lease to Martin Marietta.  (MSMF ¶ 3.)  The Gravel Lease authorizes Martin Marietta to mine gravel and engage in other operations related to mining, including reclamation, at the Iversons' property.  (MSMF ¶ 4.)  The Gravel Lease is a valid contract that imposes binding obligations on Martin Marietta.  (MSMF ¶ 5.)

During its work at the Iversons' property, Martin Marietta excavated an area referred to as the "Iverson Pit."  (MSMF ¶ 6.)  On August 30, 2018, the Colorado Division of Water Resources ("DWR") issued a "Show Cause" order to the Iversons. (MSMF ¶ 7.)

On December 21, 2020, Martin Marietta filed with the Colorado Division of Reclamation, Mining and Safety ("DRMS") a request for full release of the remaining permitted area for the Iverson Pit, consisting of 28.0 acres that includes the lake itself and an access corridor to it as depicted on the map included with the request.  (ECF No. 69 Statement of Additional Material Undisputed or Disputed Facts ("SAMF") ¶ 21.)

On February 11, 2021, DRMS issued a letter to Martin Marietta, which attached a February 9, 2021, DWR denial of Martin Marietta's request for a final reclamation

---

[1] The following factual summary is largely based on the parties' briefs on the Motion and documents submitted in support thereof.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination. Facts disputed by the parties are noted as such.

release of the Iverson Pit.  (MSMF ¶ 8; SAMF ¶ 22; ECF No. 67-6.)  However, Martin

Marietta denies that DWR's letter was a "denial of MMM's request for a final reclamation

release of the Iverson Pit."  Instead, Martin Marietta avers that DRMS's letter constituted

a denial of final reclamation release of the Iverson Pit and referenced a comment letter

from the DWR as the specific reasons for the denial.  (ECF No. 69, Response to

Movants' Statement of Material Facts ("RMSMF") ¶ 8; SAMF ¶ 22.)  DWR's comment

letter, which was attached to DRMS's release request denial, stated that the release

should be denied because "the exposed groundwater pond at the Iverson Pit site is not

included in any valid substitute water supply plan or decreed augmentation plan."[2]

(SAMF ¶ 23; ECF No. 67-6 at 2.)  Additionally, the letter stated that "[t]he operator has

not demonstrated that reclamation has been achieved so that existing and reasonably

potential future uses of groundwater are protected as required by Rule 3.1.7(8) of the

Mineral Rules and Regulations of the Colorado Mined Land Reclamation Board for the

Extraction of Construction Materials."  (ECF No. 70 Response Concerning Additional

Disputed Facts ("RCAF") ¶ 23; ECF No. 67-6 at 2.)

On March 5, 2021, DRMS issued a letter to Martin Marietta.  (MSMF ¶ 9; ECF

No. 67-7.)  DRMS requested proof of a final augmentation plan decree.  (SAMF ¶ 24;

---

[2] Martin Marietta alleges in the Complaint that "Colorado law provides two methods—one on a temporary basis and one permanently—for replacing water losses from Mining Operations at  the Iverson Pit: a "Substitute Water Supply Plan" ("SWSP") or a decreed "augmentation plan." A SWSP is administratively approved by DWR and provides a temporary means to replace the loss of water caused by mining operations. A "plan for augmentation" is required to provide a permanent means to replace the loss of water caused by mining operations and must be approved by a judicial decree from the Colorado court that has jurisdiction over water matters, including plans for augmentation."  (ECF No. 1 ¶ 20.)

In its response, Martin Marietta explains that an "augmentation plan is decreed by Colorado Water Court and, in basic terms, is a plan to replace groundwater depletions with another supply of water to prevent injury to senior water rights holders."  (ECF No. 69 at 1 n.1.)

ECF No. 67-7.)  If no proof of a decree could be given, the letter stated, then DRMS would require an increased financial warranty to account for the lack of an augmentation plan and the possibility that DRMS may be required to backfill the entire pit.  (SAMF ¶ 24; ECF No. 67-7.)

On May 11, 2021, DRMS gave notice of a financial warranty increase.  (SAMF ¶ 25; ECF No. 69-8.)  The increase was for "$4,665,600.00, as necessary to address the long-term exposed groundwater liability at the site."[3]  (SAMF ¶ 25.)

In response to the financial warranty increase, Martin Marietta increased its surety bond by that amount, which resulted in an increase in the premium it pays for the bond.  (SAMF ¶ 26.)  The Iversons state that Martin Marietta has provided no evidence to support the amount or reasons for an alleged increase in bond premiums.  (RCAF ¶ 26.)  In 2021, Martin Marietta states that the premium attributable to the financial warranty increase was $12,989.00.  (SAMF ¶ 27; ECF No. 69-10.)  However, the Iversons state that Martin Marietta provided no evidence to support what portion of its surety bond premium was attributable to the financial warranty increase.  (RCAF ¶ 27.)

In 2022, Martin Marietta's total premium payment for the Iverson Pit financial warranty totaled $17,343.00.  (SAMF ¶ 28; ECF No. 69-11.)  Since DRMS denied full release of the Iverson Pit permit, Martin Marietta has continued to submit annual reports to DRMS in accordance with its permit. (SAMF ¶ 29; ECF No. 69-12.)  In 2021, the fee associated with the annual report that Martin Marietta paid to DRMS was $791.  (SAMF ¶ 30; ECF No. 69-12.)

---

[3] Initially, Martin Marietta's financial warranty for the Iverson Pit was $275,300.  (ECF No. 69-8; ECF No. 1. ¶ 17.)  The financial warranty was increased by $4,665,600 for a total financial warranty of $4,940,900.  (ECF No. 69-8; ECF No. 69-9.)

Martin Marietta alleges that it has suffered the following injuries: (a) an increase in the financial warranty required to be deposited with DRMS; (b) "additional costs" Martin Marietta will "soon be required to incur" as a direct and proximate result of the Iversons' breach; (c) costs of acquiring a water supply and applying for a permanent augmentation plan; (d) costs of obtaining an interim SWSP for the Iverson Pit; (e) costs associated with filling in the Iverson Pit; and (f) "any penalties, fees, charges to, or liability of" Martin Marietta "that results" from the Iversons' alleged breach.  (MSMF ¶ 10.)  To date, Martin Marietta has not incurred any penalties related to its work at the Iverson Pit.  (MSMF ¶ 11.)

The Iversons state that Martin Marietta has not pursued an additional source of water for an interim SWSP or permanent augmentation plan at the Iverson Pit.  (MSMF ¶ 12.)  Martin Marietta admits as much but avers that it has no legal obligation under the Lease to perform the acts stated.  (RMSMF ¶ 12.)

Martin Marietta has not incurred any costs to fill in the Iverson Pit.  (MSMF ¶ 13.) Martin Marietta admits as much but avers that it has incurred costs to maintain a reclamation bond that is based on the potential future cost to backfill the pit.  (RMSMF ¶ 13.)

Martin Marietta sought and received approvals for multiple SWSPs at the Iverson Pit prior to 2018.  (MSMF ¶ 14.)  Martin Marietta admits as much but denies the statement to the extent that it implies Martin Marietta has or had a legal obligation to seek or receive SWSP approvals under the Lease.  (RMSMF ¶ 14.)

Since 2017, Martin Marietta has not obtained an SWSP for the Iverson Pit and has taken the position that it is the Iversons' obligation to obtain their own SWSP

pursuant to Paragraph 6 of the Gravel Lease.  (MSMF ¶ 15.)  Martin Marietta states that

the SWSP approval it obtained in 2017 was effective through March 31, 2018 and takes

the position that the Iversons are obligated to obtain their own temporary SWSP based

on Paragraph 6.  (RMSMF ¶ 15.)

Paragraph 6 provides in full:

> 6. Water Augmentation and Dewatering.  Lessor *shall* be
> responsible for *any* augmentation plan made necessary by
> the Company's surface exposure of groundwater,
> dewatering or mining operations on the Property.  If the
> State Engineer determines that a temporary plan is
> necessary for the Company's operations on the Property,
> Lessor shall provide the water required for the Company to
> implement any such temporary substitute supply or
> augmentation plan.  If Lessor fails to obtain the necessary
> plan of augmentation, or substitute source of supply, or
> otherwise fails to supply necessary water and water rights,
> the Company *may* do so and charge the cost thereof to
> Lessor.  Such estimated cost shall be amortized by
> renegotiation of the annual Advance Minimum Royalty and
> the Production Royalty rate, applied to the estimated
> Material to be removed, over the life of the deposit on the
> Property.

(ECF No. 66-2 (emphasis added).)  The Iversons are responsible under Paragraph 6 of

the Gravel Lease for obtaining an augmentation plan decree.  (SAMF ¶ 18.)  The

Iversons have failed to apply for or obtain an augmentation plan decree from Colorado

Water Court.  (SAMF ¶ 19.)  Under the Gravel Lease, as extended pursuant to

Paragraph 2, the term of the Gravel Lease ended on September 30, 2019.  (SAMF ¶

20.)

**B.    Martin Marietta's Withholding of Iversons' Royalties**

Paragraph 3 of the Gravel Lease concerns Sales Royalties:

> A. Subject to Paragraphs 3.B. and 4, for all Materials sold
> from the Property during each calendar month, the Company
> shall pay to Lessor a royalty at the rate of 60 cents ($0.60)

per product ton of 2,000 pounds (the "Base Royalty") within twenty (20) days after the close of such calendar month.

B. The royalty rate shall be adjusted every year on the first day of the month following the anniversary of the date this Lease becomes effective (the "Adjustment Date"). The basis for this adjustment shall be the Producer Price Index—Construction Sand/Gravel/Crushed Stone—Series ID No. WPU 1321, published by the United States Department of Labor, Bureau of Labor Statistics (the "Index''). The adjusted royalty shall be determined by dividing the monthly Index last published before such Adjustment Date by the monthly Index last published when this Lease becomes effective and then multiplying the quotient by the Base Royalty so as to increase or decrease the Production Royalty rate per ton beginning on the first Adjustment Date and each subsequent Adjustment Date thereafter based on such calculation. The foregoing ratio of Indexes shall be calculated on data with base year 1982 = 100 until the Bureau of Labor Statistics publishes data with a new base period. If the Index just described or one reasonably similar thereto is no longer published, then an index or adjustment accomplishing as nearly as practical the result which would have been obtained by using the stated Index if it had been available shall be selected by agreement of the parties hereto.

C. The Company shall keep and maintain adequate and accurate records of the quantities of Materials mined and sold. The royalty payments shall be accompanied by a monthly statement with the royalty calculation that includes an accounting of the tons of Materials mined from the Property and sold or deemed sold pursuant to Paragraph 5.C. for the month. Lessor shall have the right at all reasonable times during business hours and upon reasonable prior notice to examine such records of the Company at the offices of the Company and to verify the quantities of Materials removed, and sold and the accuracy of the scales used to weigh the Materials.

(ECF No. 66-2 at 2.)

In October 2017, MMM through its attorney at the time, Wayne Forman, informed the Iversons' attorney that Martin Marietta was then withholding about $464,000 of

royalty payments "to ensure there were adequate funds to acquire any additional water rights and successfully pursue an augmentation plan" if the Iversons failed to do so as contemplated by the Gravel Lease.  (SAMF ¶ 31.)  To resolve the Iversons' failure to obtain an augmentation plan and Martin Marietta's retention of royalty payments, on October 9, 2017, Martin Marietta offered to release $200,000 of the retained royalties to the Iversons to help them "to prepare and file an augmentation plan"; "once [that] application is filed, Martin [Marietta] would then release the balance of the retained royalties."  (SAMF ¶ 33.)  The Iversons assert that Martin Marietta improperly withheld the royalty payments and had no contractual authority to do so.  (RCAF ¶ 33.)

The parties corresponded regarding the royalty payments.  (SAMF ¶¶ 34–35.)  In an e-mail response three days later, the Iversons' attorney, Ashley Pollock, wrote to "confirm our agreement regarding the royalty payments Martin Marietta is holding." (SAMF ¶ 34; ECF No. 69-13 at 10.)  Ms. Pollock's e-mail also indicated that "we hope to have the application filed on or before December 31, 2017."  (SAMF ¶ 34; ECF No. 69-13 at 10.)  Ms. Pollock reiterated the Iversons' intent to file an augmentation plan application "before the end of the year" in a subsequent e-mail two weeks later on October 27, 2017.  (SAMF ¶ 35.)

Martin Marietta paid the Iversons $200,000 of the withheld royalties in exchange for their promise to file an augmentation plan application.  (SAMF ¶ 36.)  However, the Iversons did not file an application for approval of an augmentation plan by the end of 2017, nor have they done so between 2017 and the present .  (SAMF ¶¶ 37–38.)

Through a water resources engineering company (W.W. Wheeler & Associates, Inc.) hired by their attorneys, the Iversons submitted a SWSP request for the Iverson Pit

to DWR on March 28, 2018.  (SAMF ¶ 39; ECF No. 69-14.)  The Iversons directed their engineer to withdraw that SWSP application before it was approved, and their engineer did so via an e-mail to DWR on June 19, 2018.[4]  (SAMF ¶ 40.)

Martin Marietta presently holds $265,124.46 of royalties "in escrow" that it has not paid to the Iversons.  (MSMF ¶ 16.)

### III. PROCEDURAL HISTORY

On August 9, 2021, Martin Marietta filed its Complaint, alleging breach of contract against the Iversons.  (ECF No. 1.)  On September 2, 2021, Jeanne Iverson filed her Answer.  (ECF No. 9, 12 (ECF No. 12 was a correction to Jeanne Iverson's Answer).)  On October 18, 2021, Timothy Iverson filed his Answer.  (ECF No. 22.)  In their Answers, the Iversons brought Counterclaims for breach of contract against Martin Marietta pursuant to several theories, including—relevant here—failure to pay royalties.  (Id. at 6; ECF No. 9 at 9.)  They also both raise an impossibility defense.[5]  This case is set for a five-day trial to the Court to begin on April 29, 2024.  (ECF No. 74.)

---

[4] The W.W. Wheeler engineer's e-mail to engineers at DWR explained that

> Iverson Lake was previously included in a SWSP obtained by the gravel mining operator, Martin Marietta, which was approved pursuant to 37-90-137(11) C.R.S for a period of September 15, 2017 through March 31, 2018.  The Martin Marietta SWSP was a combined plan for multiple gravel mining operations.  Mr. Iverson has informed me that Iverson Lake should continue to be included in Martin Marietta's combined 37-90-137(11) SWSP because Martin Marietta can still mine material from the property and reclamation has not been completed.  Mr. Iverson also directed me to discontinue pursuing the pending 308(5) request.

(ECF No. 69-15 at 5–6.)

[5] Martin Marietta explains that the Iversons filed separate Answers and Counterclaims, but their respective Counterclaims and impossibility defenses are essentially identical.  (ECF No. 66 at 1 n.2.)

## IV. ANALYSIS

**A.     Martin Marietta's Breach of Contract Claim**

       1.      <u>Martin Marietta Has Standing to Bring Its Breach of Contract Claim</u>

           a.    *Nature of the Jurisdictional Attack*

The Court first considers whether the Iversons bring a facial or factual attack for lack of subject matter jurisdiction.  The Iversons inexplicably prevaricate on whether their attack is facial or factual.  (ECF No. 67 at 5 ("Regardless of whether the challenge is facial or factual, Martin Marietta bears the burden of establishing standing to pursue its claim.").)  Nevertheless, the Iversons attack the allegations in Martin Marietta's Complaint and supports the Motion with extrinsic evidence.  *See Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1295 (10th Cir. 2003) (noting that the defendants' attack was a factual one, as they challenged not just the plaintiffs' allegations of jurisdiction but also the facts underlying those allegations).

"As a general rule, a 12(b)(1) motion cannot be converted into a motion for summary judgment under Rule 56."  *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987) (citing *Nichols v. United States*, 796 F.2d 361, 366 (10th Cir. 1986)).  The Tenth Circuit explains that "[t]here is, however, a widely recognized exception to this rule.  If the jurisdictional question is intertwined with the merits of the case, the issue should be resolved under 12(b)(6) or Rule 56."  *Id.* (citing *Timberlane v. Bank of America*, 749 F.2d 1378 (9th Cir. 1984) (additional citations omitted)).

The Iversons argue that resolution of whether Martin Marietta has suffered injury in fact will resolve whether it has suffered damages to support its breach of contract claim, and therefore, the Court must treat the Rule 12(b)(1) motion as a motion under Rule 56.  (ECF No. 67 at 12.)  Martin Marietta does not address the issue.  (ECF No.

69.)  Nevertheless, the Court agrees that to an extent, the jurisdictional question is intertwined with the merits of the case; therefore, the Court resolves this issue under Rule 56.  *Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).

      b.    *Standing*

For a court to have subject matter jurisdiction, a plaintiff must have standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000).  At its "irreducible constitutional minimum," standing has three elements.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  First, a plaintiff must suffer an "injury in fact" that is concrete and particularized, and actual or imminent, not conjectural or hypothetical.  *Id.* Second, the injury must be traceable to the challenged action of the defendant.  *Id.* Third, it must be likely that the injury will be redressed by the relief requested.  *Id.* Standing is determined as of the time the action is brought.  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

The "injury in fact" requirement is satisfied differently depending on whether the plaintiff seeks prospective or retrospective relief.  *See Tandy v. City of Wichita*, 380 F.3d 1277, 1283–84 (10th Cir. 2004) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 105 (1983)).  To seek prospective relief, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future.  *Id.*  Past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.  *Id.* (citation omitted).  However, the threatened injury must be "certainly impending" and not merely speculative.  *Id.* (citation omitted).  A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction.  *Id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  To seek

retrospective relief, the plaintiff "satisfies the 'injury in fact' requirement if [it] suffered a past injury that is concrete and particularized."  *Id.*

In this case, Martin Marietta states that it seeks both retrospective (monetary) and prospective (injunctive) relief, though the Iversons dispute whether Martin Marietta has requested injunctive relief.

(i)      Injury in Fact

(a)      Retrospective Relief

The Iversons argue that Martin Marietta lacks standing because it has not suffered an injury in fact.  (ECF No. 67 at 6–8.)  The only alleged injury that the Iversons concede might support the injury in fact requirement is the increase in Martin Marietta's financial warranty deposited with DRMS, but the Iversons argue that such an increase "falls squarely within Martin Marietta's agreed-upon contractual obligations in the Gravel Lease" and cannot form the basis for its claim of injury.  (*Id.* at 7.)

In response, Martin Marietta explains that it has suffered injury because of its inability—due to the Iversons' breach—to completely close out the site and obtain a full and final release of its DRMS permit.  (ECF No. 69 at 12.)  Additionally, because the Iversons have not obtained an augmentation plan decree, DRMS gave Martin Marietta notice of a financial warranty increase on May 11, 2021.  (*Id.* at 14.)  The increase was for $4,665,600, which resulted in an increase in the premium Martin Marietta pays for the bond; specifically, the premium attributable to the financial warranty increase in 2021 was $12,989, and in 2022, the premium increased to $17,343.  (*Id.* at 15.)

The Court finds that Martin Marietta has sufficiently alleged that it suffered an injury in fact based both on its inability to completely close out the site, which has resulted in an increased financial warranty and, as a result, increased premium

14

payments.  The Iversons' argument that such payments fall within Martin Marietta's contractual obligations ignores the fact that the increases are allegedly due to the *Iversons'* breach of contract based on *their* failure to obtain an augmentation plan decree.  (*See id.* at 16.)

Further, the Iversons' argument that Martin Marietta has failed to pursue the contractual remedy provided in the Gravel Lease under Paragraph 6 is unavailing. (ECF No. 70 at 6.)  Paragraph 6 provides that if the Iversons fail to obtain the necessary plan of augmentation, then Martin Marietta "may do so and charge the cost thereof to [the Iversons]."  Martin Marietta chose not to do so and instead chose to levy breach of contract claims at the Iversons.  The Iversons provide no evidence or law supporting their argument that Martin Marietta was *required* to assume the Iversons' obligations under Paragraph 6, when the contract plainly uses the word "may."  Accordingly, the Court finds that Martin Marietta has alleged injury in fact and denies this portion of the Motion.[6]

---

[6] In their reply, the Iversons argue—for the first time—that "[a]ssuming *arguendo* that MMM's assertion of actual damages in the form of increased financial warranty and a $791 fee paid to the DRMS for an annual report submitted in 2021 supports standing . . ., MMM's resulting damages would be insufficient for this Court to assert subject matter jurisdiction." (ECF No. 70 at 7–8.)

Typically, the Court would deem this argument waived, as a failure to raise an issue in an opening brief waives that issue.  *Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005) (citation omitted).  However, because the argument concerns this Court's subject matter jurisdiction, the Court directed Martin Marietta to file a sur-reply limited to the issue of amount in controversy (ECF No. 78) and has considered both parties' arguments.

Martin Marietta states that the amount in controversy is met by the allegations of its damages including the cost of the financial warranties required by DRMS of the Iverson Pit, the cost of filling the Iverson Pit to comply with requirements of the State of Colorado, the cost of acquiring a water supply for use in any augmentation plan required by the State of Colorado for the Iverson Pit, the cost of filing for any augmentation plan required by the State of Colorado for the Iverson Pit, the cost of obtaining an interim SWSP for the Iverson Pit, and any penalties, fees, charges to, or liability of, Martin Marietta that results from Iversons' breach of the Gravel

(b)     Prospective Relief

To obtain injunctive relief, a party must plead and prove the following elements: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction is in the public interest." *Ajjarapu v. AE Biofuels, Inc.* 728 F. Supp. 2d 1154, 1169 (D. Colo. 2010).

In the Motion, the Iversons argue that "MMM seeks only damages related to its breach of contract claim—not injunctive relief—therefore an argument that it is exposed to a mere risk of future harm does not suffice to support standing."  (ECF No. 67 at 8.)

In response, Martin Marietta cites that portion of the Complaint that seeks an award of "such other and further relief to Martin Marietta as it deems just and proper." (ECF No. 69 at 13 (citing ECF No. 1, Request for Relief, ¶¶ A–C).)  Martin Marietta further relies on Rule 54(c) for the proposition that the Court may award injunctive relief not explicitly requested.  (*Id.* at 13–14); Fed. R. Civ. P. 54(c) ("Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").  And, "[i]f and to the extent that the Court finds that Martin Marietta did not adequately plead injunctive relief in its prayer for relief and it is not available under Fed. R. Civ. P. 54(c)," then Martin Marietta states that it "reserves the right to seek leave to amend its complaint to incorporate that form of relief for its breach of contract claim."  (ECF No. 69 at 14 n.3.)

---

Property Lease.  (ECF No. 78 at 4.)

Given the allegations identified above by Martin Marietta and the evidence in the record that DRMS increased Martin Marietta's financial warranty to $4,940,900 (ECF No. 69-8), the Court concludes that the amount in controversy has been met.

In its response brief, Martin Marietta outlines its vision of a permanent injunction in this case:

> [A]n injunction requiring the Iversons to apply for and obtain an augmentation plan decree (at their cost), and to cover Martin Marietta's financial warranty premiums, annual report fees, and any other costs incurred in the interim, would redress Martin Marietta's ongoing injury while the Iversons' augmentation plan application is pending and (assuming the Iversons comply with the injunction) resolve Martin Marietta's current inability to obtain full release of its Colorado DRMS permit.

(ECF No. 69 at 19.)

The Court agrees with the Iversons that Martin Marietta failed to allege its entitlement to injunctive relief and grants this portion of the Motion.  (*See* ECF No. 1.) Additionally, as the Iversons point out, a "permanent injunction is appropriate when the remedy at law is inadequate to compensate the injury sustained.  The classic remedy for breach of contract is the award of monetary damages."  *Tri-State Generation & Transmission Ass'n v. Shoshone River Pwr., Inc.*, 874 F.2d 1346, 13543-54 (10th Cir. 1989).  In other words, even with all of the damages alleged by Martin Marietta, it is unclear how it could suffer irreparable harm absent an injunction, and why monetary damages would not suffice.  The Iversons also emphasize that discovery has closed, and the deadline for amending the pleadings has long since passed.  (ECF No. 70 at 10.)

The Court acknowledges Martin Marietta's apparent intention to move to amend its Complaint.  No such motion has been filed, and the Court does not prejudge arguments that have not yet been made; nonetheless, the Court will look critically at any such future motion, particularly given the close of discovery, the passing of the deadline

to amend the pleadings, and the looming trial date.

(ii)     Causation

The Iversons argue that Martin Marietta's conduct—not their own—caused the alleged injuries.  (ECF No. 67 at 9.)  They rely on Paragraph 7(E) of the Gravel Lease, which they contend requires Martin Marietta to obtain a SWSP, which is a one-year governmental approval from DWR to temporarily approve replacement of water losses. (*Id.*)  According to the Iversons, Martin Marietta was required under Paragraph 7(E) to apply for the necessary SWSPs at the Iverson Pit, at Martin Marietta's cost, related to Martin Marietta's operations at the Iverson Pit.  (*Id.*)  In 2018 and continuing until at least the point at which DRMS increased the financial warranty, the Iversons argue that Martin Marietta breached the Gravel Lease by failing to obtain an SWSP for the Iverson Pit, instead taking the position that it is the Iversons' obligation to obtain their own SWSP.  (*Id.*)  In other words, but for Martin Marietta's failure to obtain the governmental approvals it is contractually obligated to obtain under the Gravel Lease, the Iversons argue that Martin Marietta's alleged injuries would have never occurred.  (*Id.* at 10.)

In response, Martin Marietta argues that its damages and other injuries are "directly traceable to the Iversons' breach of the Gravel Lease," and but for the Iversons' "failure to obtain an augmentation plan decree, DWR would not have recommended denial of [MMM's] full release request for lack of an augmentation plan decree . . . and would not have denied the release on that basis."  (ECF No. 69 at 17.)  Additionally, but for the Iversons' failures, Martin Marietta argues that the financial warranty and premiums would not have increased.  (*Id.*)

Martin Marietta directly attacks the Iversons' arguments regarding Paragraph 7(E):

> Paragraph 7.E did not make Martin Marietta responsible for obtaining SWSPs for the Iverson Pit because Paragraph 6 of the Lease places the responsibility of water augmentation on the Iversons.  Martin Marietta opted to obtain SWSP approvals before 2018 as interim stop-gaps because the Iversons have not obtained the governmental approval they are responsible for under Paragraph 6 of the Lease: an augmentation plan decree.[]  Motion at 9.  If the Iversons do not have a permanent augmentation plan decree in place, then they are liable for obtaining any temporary approvals required by Colorado law in the meantime.  In sum, Martin Marietta is not required under the Lease to obtain temporary SWSP approvals, and thus its injuries are traceable to the Iversons, not to its own actions.

(*Id.* at 18.)

The Court agrees that Martin Marietta's alleged injuries are traceable to the alleged failure of the Iversons to obtain an augmentation plan decree under Paragraph 6 of the Gravel Lease.  Therefore, this portion of the Motion is denied.

(iii)    Redressability

The Iversons make no argument concerning the redressability element.  (*See* ECF No. 67.)  Therefore, the Court finds that they concede this element and addresses it no further.

In sum, while the parties dispute whether Martin Marietta has suffered an injury in fact and which party's actions caused its injury, the Court finds that Martin Marietta has alleged sufficient facts to create a genuine issue of material fact sufficient to withstand the motion for summary judgment.

2.    <u>The Iversons Are Not Entitled to Summary Judgment on Martin Marietta's Breach of Contract Claim</u>

Under Colorado law, a party seeking to recover on a breach of contract claim muse prove: (i) the existence of a contract, (ii) performance by the claimant (Martin Marietta) or some justification for nonperformance, (iii) failure to perform the contract by

the other party (the Iversons), and (iv) resulting damages to the claimant.[7]  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

With respect to the first element, there is no dispute that the Gravel Lease is a valid contract that binds the parties.  (ECF No. 67 at 11; ECF No. 69 at 20.)  The Iversons make no argument with respect to the third element.

With respect to the second element, the Iversons argue that Martin Marietta failed to perform its contractual obligations and has no justification for its nonperformance.  (ECF No. 67 at 11.)  They specifically argue that Paragraph 7(E) is clear and unambiguous in its requirement that Martin Marietta apply for and obtain governmental approvals and there is no genuine issue of material fact that Martin Marietta did not perform its obligations thereunder.  (*Id.*)

With respect to the fourth element, the Iversons argue that Martin Marietta has not suffered damages because "the only amount MMM has actually incurred of the various damages it alleges is an increase in financial warranty, which is within the scope of MMM's contractual obligations under the Gravel Lease."  (*Id.* at 12.)  Moreover, the Iversons argue that Martin Marietta cannot show its damages were caused by the Iversons' conduct.  (*Id.*)

In response, Martin Marietta argues that the Gravel Lease does not require it to obtain governmental approvals required solely because of the Iversons' failure to obtain an augmentation plan decree.  (ECF No. 69 at 21.)  It contends that "[a]ssigning liability on Martin Marietta for the Iversons' failure to obtain an augmentation plan decree would

---

[7] Although the Iversons point out that the Gravel Lease "does not appear to contain a choice of law provision," the parties nonetheless agree that Colorado substantive law applies to this action.  (ECF No. 67 at 10; ECF No. 69 at 20.)  The Court finds that they are estopped from arguing otherwise going forward.

render the Iversons' contractual obligation in Paragraph 6 a nullity." (*Id.*) Additionally, Martin Marietta argues that it has suffered damages as a direct result of the Iversons' breach. (*Id.* at 22.)

Under Colorado law, "[o]nce the terms of the agreement have been identified, the fact finder must determine whether the party accused of breaching has performed its obligations under the contract. Whether a party has performed its obligations under a contract or breached is a question of fact." *Little Thompson Water Ass'n v. Strawn*, 466 P.2d 915, 917 (Colo. 1970). Here, as explained earlier in this Order, the parties both contend that the other side has failed to perform its obligations under the Gravel Lease. Accordingly, having thoroughly considered both parties' arguments, the Court concludes that a genuine issue of material fact exists regarding performance and denies summary judgment on that basis.

## B.     Iversons' Counterclaim for Breach of Contract - Payment of Royalties

The elements of the Iversons' breach of contract claim are the same as outlined above, *supra* Part IV.A.2. The Iversons argue that they are entitled to summary judgment on their Counterclaim for breach of contract against Martin Marietta for failure to pay royalties, which is subpart (a) of the Counterclaim. (ECF No. 67 at 12.) They rely on Paragraph 3 of the Gravel Lease and point out that Martin Marietta admits that it holds $265,124.46 in royalties in escrow and has not paid that money to the Iversons. (*Id.* at 14.) Further, the Iversons argue that such withholding of payment has caused them damage and is not permitted by the Gravel Lease. (*Id.*) Thus, according to the Iversons, there is no genuine issue of material fact as to whether Martin Marietta is contractually obligated to pay them royalties under Paragraph 3 and whether it failed to do so. (*Id.*)

Martin Marietta points out that the Iversons do not address one of the elements of their claim, namely, whether they fully performed under the Gravel Lease, or whether they have grounds for justified nonperformance.  (ECF No. 69 at 24.)  On this basis alone, Martin Marietta argues that the Court should deny their summary judgment request.  (*Id.*)

The Court agrees.  Rule 56 requires a movant to show that there is no genuine dispute as to any material fact, and the Iversons' failure to address all elements of the breach of contract claim precludes the Court from granting them summary judgment on their breach of contract claim for failure to pay royalties.  Regardless, based on its review of the facts and law submitted by both parties, the Court finds that a genuine issue of material fact exists concerning whether the Iversons performed their obligations under the Gravel Lease.  As a result, the Court denies this portion of the Motion.

## V. CONCLUSION

For the reasons stated above, the Court ORDERS that the Motion (ECF No. 67) is GRANTED IN PART AND DENIED IN PART as follows:

1.      The Motion is GRANTED to the extent that the Court finds that Martin Marietta has not alleged a request for injunctive relief; and

2.      The Motion is otherwise DENIED.

Dated this 20th day of September, 2023.

BY THE COURT:

William J. Martínez
Senior United States District Judge